694 P.2d 510

**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Ruben Robert HERRERA,**
**Defendant-Appellant.**

**No. 15231.**

Supreme Court of New Mexico.

Jan. 22, 1985.

Paul Bardacke, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Martha A. Daly, Rothstein, Bailey, Bennett & Daly, Santa Fe, for defendant-appellant.

**OPINION**

RIORDAN, Justice.

Defendant Ruben Robert Herrera (Herrera) was charged with the first-degree murder of Leroy Lovato (Lovato) and with aggravated assault with a firearm on Phillip Arellanes (Arellanes). Upon Herrera's motion, a change of venue from San Miguel County to Santa Fe County was granted. Herrera was subsequently tried and convicted of both crimes and was sentenced to life imprisonment for the murder, eighteen months imprisonment for the aggravated

assault (to run concurrently with the life sentence), and one year imprisonment for the firearm enhancement. The trial court ordered that Herrera first serve the one year firearm enhancement and that the other two sentences would run consecutive to it. Herrera appeals. We affirm the convictions but remand for resentencing.

The issues on appeal are:

I. Whether the search warrant under which Herrera's residence was searched and certain evidence seized was based upon insufficient probable cause, and if so, whether the trial court erred in admitting such evidence at trial.

II. Whether the trial court abused its discretion in excluding evidence of prior bad acts by two State witnesses.

III. Whether Herrera was denied his common law right of allocution at sentencing.

**FACTS.**

On November 5, 1982, Herrera, Lovato, and Arellanes were all present at the El Nido Nightclub. During the course of the evening, Herrera and Lovato had a slight altercation regarding Lovato's cousin. The incident was brief, and Herrera left the nightclub shortly thereafter. Later that night, Lovato and Arellanes were leaving the nightclub with two women. The women were a few steps ahead of Arellanes, who was in front of Lovato. Arellanes testified that he called out to the women to wait and then noticed Herrera approaching the group. Lovato, who was standing with his hands in his pockets, made a gesture as if to shake Herrera's hand. Herrera pulled up his jacket, pulled out a gun, and shot Lovato in the throat. Lovato fell to the ground, blood spraying from the wound. Herrera then turned the gun on Arellanes, who believed he would be the next person shot. Arellanes looked down and did not look up again until the two women informed him that Herrera had gone.

When the police arrived to investigate, they found one nine-millimeter spent casing on the ground, but found no weapon. Arellanes (the only eyewitness to the actual shooting) later identified Herrera from a photographic array. Various other witnesses (including the two women) identified Herrera as being at the crime scene. Herrera was later apprehended by police while driving a car from the general direction of his home.

## I. Search Warrant.

Based upon the above, police officers prepared an affidavit for the search of Herrera's home. A warrant was issued, and the search disclosed one nine-millimeter clip, one nine-millimeter casing, and one live nine-millimeter round.

 The law in New Mexico is that before a valid search warrant may issue, substantial evidence in the affidavit must show: (1) that the items sought to be seized are evidence of a crime; and (2) that the criminal evidence sought is located at the place to be searched. *State v. Baca,* 97 N.M. 379, 379–80, 640 P.2d 485, 485–86 (1982). Furthermore, the existence of probable cause to believe that a suspect has committed murder is ordinarily sufficient to justify a search of the suspect's home, the surrounding area, and his business. *State v. Ferrari,* 80 N.M. 714, 718, 460 P.2d 244, 248 (1969).

The affidavit in the instant case recited sufficient information to establish probable cause to believe that Herrera had committed the murder of Lovato. However, the affidavit did not contain any facts stating why police officers believed that the residence to be searched was Herrera's home, or alternatively, any information as to why police officers believed that the evidence sought would be located at the place to be searched. A thorough description of the residence to be searched was stated in the affidavit. The affidavit further stated in pertinent part:

> [A]t approximately 4:00 A.M. on November 5, 1982, Defendant Robert Herrera was apprehended driving an automobile,

heading east and coming from the general direction of *his residence, above described;* that at approximately 6:40 A.M., on November 5, 1982, Affiant drove to *Defendant's residence, above described,* and while the ground and some tire tracks directly in front of *defendant's residence* were frozen, Affiant also noticed fresh tire marks, which were not frozen, on the alley way directly in front of the *Defendant's residence.* (Emphasis added.)

The affidavit merely concludes that the described residence was Herrera's home. No basis for such conclusion appears on the face of the affidavit.

The State concedes that the affidavit lacked any descriptive facts showing that the described residence was indeed Herrera's home. However, the State asserts that the affidavit provided the issuing magistrate with sufficient information to infer and conclude that the residence to be searched was Herrera's home. In support of this assertion, the State cites *State v. Snedeker,* 99 N.M. 286, 657 P.2d 613 (1982). *Snedeker* involved a situation where the affidavit in support of the search warrant failed to state specific reasons for believing that the stolen property would be located in the defendant's home. This Court held that where the stolen property was not inherently incriminating and probable cause existed to believe that the defendant had committed the theft, the magistrate could assume that the property could be found at the defendant's residence. *Id.* at 293, 657 P.2d at 620. However, unlike the situation in the instant case, the affiant in *Snedeker* stated that he had personal knowledge of where the defendant resided. Thus, the magistrate in *Snedeker* was given at least some facts from which the inference could be made that the defendant resided at the residence to be searched. Thus, although *Snedeker* would allow a magistrate to assume that certain stolen property might be located at a suspect's residence, the case does not do away with the basic requirement that the residence to be searched must be established to be that

of the suspect, or alternatively, that the items sought to be seized are located at that residence. *Snedeker* stated:

A material fact need not be proved by direct evidence. It is sufficient if there is evidence from which the fact can properly be inferred.

*Id.* at 290, 657 P.2d at 617 (citation omitted).

■ The State argues that a proper inference that Herrera resided at the described residence can be drawn from the following evidence presented in the affidavit: (1) that the residence was described in substantial detail; (2) that Herrera was apprehended while driving away from the "general direction" of the described residence; and (3) that the affiant observed unfrozen, fresh tire tracks at the described residence. However, merely because a residence is described in even minute detail does not provide a magistrate with the necessary evidence to infer that a suspect makes such residence his home nor does the fact that a suspect is within the vicinity of a certain residence provide the necessary information to the magistrate to infer that the suspect resides at that residence. *Cf., State v. Baca*, 97 N.M. at 380, 640 P.2d at 486 (1982) (fact that getaway car was found abandoned within a five mile radius of the described premises could not aid in establishing that items sought would be found at those premises). Such information might be enough to lead a magistrate to infer that a suspect resides in the vicinity, but it is insufficient to create the inference that a suspect resides at a certain described residence in that general area. Finally, the tire tracks do not provide any evidence upon which a magistrate could reasonably infer that Herrera lived at the residence or even that Herrera was driving the vehicle that made the tracks. There was virtually no evidence presented in the affidavit from which a magistrate could properly infer that the place to be searched

was Herrera's residence. The affidavit merely stated the conclusion that the described residence was Herrera's home.

■ There were insufficient facts to show probable cause to search the premises described for evidence of Lovato's murder; therefore, the search was illegal under both state and federal guarantees against unreasonable searches and seizures. U.S. Const. amend. IV; N.M. Const. art. II, § 10.[1] However, we conclude that the admission of the illegally seized items was harmless error because the evidence seized could only have had an insignificant effect on the verdict in light of the eyewitness accounts of the shooting and events immediately thereafter.

For trial court error to be considered harmless, there must be:

(1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so miniscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.

*State v. Moore*, 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980) (citations omitted).

In the instant case, there is testimony of five State witnesses regarding the shooting and the events immediately thereafter. The first of these was the eyewitness testimony of Phillip Arellanes. He directly witnessed the shooting of Lovato and was himself threatened at gunpoint by Herrera.

The next four witnesses did not witness the actual shooting but did witness the events immediately thereafter. Debra Farell (one of the two women that had been leaving the nightclub with Lovato and Arellanes) testified that she was five or six steps in front of the point of the shooting.

---

1. The State urges this Court to adopt the good faith exception to the exclusionary rule as has recently been adopted by the United States Supreme Court in *United States v. Leon*, — U.S. —, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); and *Massachusetts v. Sheppard*, — U.S. —, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). However, our disposition of this case is such that we do not find it necessary to discuss the good faith exception at this time.

She heard a loud noise, turned, and saw Lovato on the ground and smoke in the air. She saw a man crossing the street with a smile on his face, looking straight at her. She noticed that he was pushing a gun into his clothing.

Denise Martinez was the other woman who was leaving the nightclub with Lovato and Arellanes. She testified to substantially the same facts as Ms. Farell regarding their position to the shooting scene and the events immediately after the shooting. Ms. Martinez testified that she saw Herrera running away from the crime scene but never saw Herrera with a gun.

Robert Arellanes testified that he heard the shooting and immediately thereafter saw Herrera, whom he had known for fourteen to fifteen years, running across the street, stuffing what appeared to be a gun into his pants.

Julian Bustamante was with Robert Arellanes that evening. Bustamante testified to substantially the same observations as Robert, except that Bustamante did not see Herrera with a gun. Bustamante testified that he had known Herrera since high school and had no difficulty identifying him at the scene or in court.

Thus, given the substantially corroborative testimonies of these five witnesses, there was overwhelming evidence to support Herrera's conviction without any reference to the improperly admitted evidence. Its admission contributed little, if anything, to the conviction. Further, Herrera presented no substantial conflicting evidence that would have discredited these State witnesses. Therefore, although the admission of such evidence was error, it was harmless error and Herrera's convictions are properly affirmed under this point. *State v. Moore.*

## II. Prior Bad Acts.

Pursuant to NMSA 1978, Evid.Rule 608(b) (Repl.Pamp.1983), Herrera sought to impeach Phillip and Robert Arellanes by inquiring into their prior bad acts and misconduct involving dishonesty. To prevent such inquiry, the State filed motions *in limine* to limit the scope of the cross-examination concerning the alleged bad acts. Over Herrera's objection, the trial court granted these motions and prevented Herrera from asking about any prior bad acts other than one resulting in an official admission or conviction. However, the trial court did allow Herrera to impeach Phillip Arellanes with two prior felony convictions and to impeach Robert Arellanes with the allegation of a prior receiving stolen property charge.

Herrera alleges that the trial court abused its discretion in denying cross-examination of Phillip and Robert Arellanes regarding several charges of criminal misconduct not resulting in convictions or official admissions.

Rule 608(b) provides in pertinent part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness
>
> > (1) concerning his character for truthfulness or untruthfulness....

Under the terms of Rule 608(b), it is within the trial court's discretion to allow such evidence of prior bad acts to be inquired into on cross-examination. Further, a trial court's rulings "will not be disturbed absent a clear abuse of discretion." *State v. Worley,* 100 N.M. 720, 723, 676 P.2d 247, 250 (1984) (citation omitted). A trial court abuses its discretion where a ruling "is clearly against the logic and effect of the facts and circumstances of the case." *State v. Simonson,* 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983) (citation omitted). On the strength of "rap sheets" pertaining to each of the two witnesses, Herrera attempted to impeach Phillip and Robert Arellanes by inquiry into certain instances of misconduct. However, these "rap sheets" only show that Phillip and Robert were

"suspects" or "involved in" or "charged with" various acts tending to show dishonesty. Herrera's position at trial and on appeal is that under Rule 608(b), the *charge* itself is a prior bad act relating to truth and veracity. Herrera misinterprets Rule 608(b). In discussing the extent of proper cross-examination under Rule 608(b), this Court noted that "[i]n considering the character of the prior conduct, the trial court must take care to distinguish *actual misconduct from a mere accusation of misconduct.*" *State v. Robinson*, 99 N.M. 674, 676, 662 P.2d 1341, 1343 (1983) (emphasis added). The test is not whether the witness sought to be impeached was arrested or charged with the misconduct but whether the witness actually engaged in the misconduct. *Id.* Therefore, being arrested, charged, or being a suspect is not a prior act of misconduct.

▮ Further, we have determined that: All reasonable care, and the utmost good faith, must be exercised by the prosecutor, when questioning an accused about prior convictions, to the end that an accused is not prejudiced by suggestions that he has been convicted of a misdemeanor or felony, when in fact he has not been so convicted. *We do not believe that cross-examination of an accused based solely on information contained in an "F.B.I. rap sheet" can ordinarily be said to be consistent with the exercise of all reasonable care and the utmost good faith.*
*State v. Williams*, 76 N.M. 578, 582, 417 P.2d 62, 65 (1966) (emphasis added). Identical safeguards govern the impeachment of a witness other than the accused. *State v. Robinson*, 99 N.M. at 676, 662 P.2d at 1343. Although the above language applies to impeachment under NMSA 1978, Evid.Rule 609 (Repl.Pamp.1983), "[n]evertheless, the same rationale applies to the impeachment of a witness under [Rule] 608(b)." *State v. Robinson*, 99 N.M. at 676, 662 P.2d at 1343.

▮ Thus, not only was the impeachment sought by Herrera improper under *Robinson* in that it was an attempt to

inquire into only charges of misconduct instead of instances of actual misconduct, such inquiry was also improper because it was based only upon the "rap sheets" and therefore was not in good faith. *State v. Williams.* Thus, it is apparent that the trial court did not abuse its discretion in excluding evidence of prior bad acts by these two State witnesses. Herrera's convictions are properly affirmed on this point.

### III. Right of Allocution.

▮ In the instant case, the trial court failed to afford Herrera his right of allocution at sentencing. The State asserts that in a case such as this where the sentence is mandatory and not subject to suspension, deferral or alteration (Herrera's life imprisonment for murder) allocution is not required. Our case law is to the contrary. *See State v. Ybarra*, 24 N.M. 413, 174 P. 212 (1918).

Therefore, the failure to afford Herrera his right of allocution requires that the sentences imposed upon him be vacated and that the cause be remanded for a new sentencing hearing in which he is given such right. *Ybarra*, 24 N.M. at 421, 174 P. at 214–15.

IT IS SO ORDERED.

FEDERICI, C.J., SOSA, Senior Justice, and WALTERS, J., concur.

STOWERS, J., specially concurring.

STOWERS, Justice, specially concurring.

I concur in the result reached in this case; however, I disagree with the opinion insofar as it finds the search warrant insufficient.

The real question is, "was there a basis from which the magistrate could infer and conclude the described premises to be that of the defendant", and the answer is yes.

As has been previously stated, the standard for reviewing affidavits for a search warrant is that there must be a common sense reading of the affidavit as a whole. *State v. Duran*, 90 N.M. 741, 568 P.2d 267 (Ct.App.1977). Applying this standard, the

reasonable conclusion is that the affidavit describes the residence of the defendant and furthermore, it complies with NMSA 1978, Crim.P.Rule 17 (Repl.Pamp.1980).